# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, | Civil No. 09-287 (JRT/JJG) |
| Plaintiff, | |
| v. | **AMENDED MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**[*] |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | |
| Defendant, | |
| and | |
| THE VALSPAR CORPORATION, | |
| Intervenor-Defendant. | |

Karen H. Ventrell, **TROUTMAN SANDERS LLP**, 401 Ninth Street N.W., Washington, DC  20004; and Jeanne H. Unger, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for plaintiff.

Dale O. Thornsjo, **O'MEARA LEER WAGNER & KOHL, PA**, 7401 Metro Boulevard, Suite 600, Minneapolis, MN  55439, for defendant.

Andrew J. Detherage, **BARNES & THORNBURG LLP**, 11 South Meridian Street, Suite 1313, Indianapolis, IN  46204; and Marta M. Chou, **BARNES & THORNBURG LLP**, 225 South Sixth Street, Suite 2800, Minneapolis, MN  55402, for intervenor-defendant.

---

[*] The Court amends its March 29, 2013 [Docket No. 220] order by correcting the characterization of International as a primary insurer in the Memorandum Opinion of the order on pages 22 and 54 and footnote 46.  In all other respects, the March 29, 2013, order is unchanged.

Plaintiff Continental Casualty Company ("Continental") brings this action against defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") seeking various forms of declaratory relief.  Continental seeks contribution from National Union for costs Continental incurred in defending The Valspar Corporation ("Valspar") against four underlying toxic tort lawsuits.  Both Continental and National Union have insured Valspar at different times during the past several decades, and the underlying lawsuits, which relate to harm caused by long term exposure to Valspar's products, triggered coverage years of both insurers.  After the complaint was filed, United States Magistrate Judge Jeanne J. Graham granted Valspar's motion to intervene as a defendant. Continental and Valspar both bring motions for summary judgment,[1] seeking a determination from the Court of whether Valspar and/or National Union are required to contribute to costs incurred by Continental in defending Valspar against the toxic tort lawsuits.  For the reasons explained below, the Court will grant in part and deny in part both motions for summary judgment.

## BACKGROUND

Valspar is a Minnesota corporation that manufactures paint, coatings, and related products.  From at least 1963 to the present, Valspar purchased commercial general liability insurance from a number of different insurers.  (Valspar Answer ¶ 8, Sept. 3, 2009, Docket No. 31.)  These policies, issued annually, generally provide that the insurer

---

[1] Although Defendant National Union did not file a motion for summary judgment, it filed a memorandum in response to Valspar's and Continental's motions, and requests judgment independent of the motion pursuant to Fed. R. Civ. P. 56(f)(1), declaring that National Union has no obligation to contribute to defense costs.

has a duty to defend lawsuits against the insured seeking damages because of bodily injury caused by a covered occurrence.  Other than the two insurance companies involved in the present dispute, Valspar's historical insurers also include Maryland Casualty Company (1961-1967), Employers Mutual Liability Company (1967-1971), Liberty Mutual Insurance Company (1976-1981; 1985-1990), American Insurance Company (1981-1984), and International Indemnity Company (1984-1985).  (Second Aff. of Kristen Quast ¶ 4, May 31, 2012, Docket No. 187.)[2]

## I.     THE CONTINENTAL POLICIES

Continental issued five commercial general liability insurance policies (the "Continental Policies") to Valspar, providing coverage from January 1, 1971, through January 1, 1976.  (Compl. ¶ 9, Feb. 9, 2009, Docket No. 1.)  Each Continental Policy provides that Continental "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [] bodily injury or [] property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage."  (*Id.* ¶ 10, Ex. A at 7.)[3]

---

[2] The names of some of these insuring entities appear to have changed.  Based upon matching the dates of the policies identified in Valspar's notice and tendering of defense in the underlying lawsuits with the dates identified in the Second Quast Affidavit, it appears that American Insurance Company is also known as Fireman's Fund Insurance Companies, Employers Mutual Liability Company is also known as Wasau/Nationwide, and Maryland Casualty Company is also known as Zurich US.  (Compl., Ex. D, Feb. 9, 2009, Docket No. 2.)

[3] Only the Policy effective from January 1, 1971, to January 1, 1972, is included as an exhibit to the complaint.  (Compl., Ex. A.)  The other four Continental Policies do not appear to be part of the record.  (*See* Third Aff. of John P. Fischer, Ex. A (Dep. of Kevin S. Horwitz ("Horwitz Dep.") 42-44), Mar. 22, 2010, Docket No. 127.)  The parties do not dispute, however,

(Footnote continued on next page.)

## II.    THE NATIONAL UNION INSURANCE PROGRAM

From 1990 through 2004 Valspar and National Union[4] entered into annual agreements which together formed an insurance program (the "Program").  Valspar and National Union claim that the Program, in its various iterations, is a form of self-insurance and that under the Program, Valspar "is responsible for payment of its own first-dollar defense and indemnity costs, through a deductible, self-insured retention, fronting arrangement, promissory note, indemnity agreement, and/or other mechanism, up to the limit of the applicable annual deductible or retention."  (Second Quast Aff. ¶ 5.)[5]

_____

(Footnote continued.)

that each Continental Policy contained the same, or substantially similar, language with respect to Continental's duty to defend Valspar.  Nor has any party disputed, at any point, that Continental has a duty to defend Valspar for liabilities arising between January 1, 1971, and January 1, 1976.  (*See id.* 42:1-3.)

[4] Various record documents refer to the entity "AIG."  The parties agree that for purposes of this motion AIG and National Union are essentially the same entity.

[5] A fronting policy typically refers to

the issuance of an insurance policy under which the insured is left to administer all claims and agrees to reimburse the insurer for all settlements or judgments paid.  Fronting policies do not indemnify the insured, as they usually are issued with a deductible or SIR equal to the amount of the policy limits and with policy language relieving the insurer of any defense obligation.  Such policies usually are issued to satisfy state financial responsibility laws by guaranteeing to third parties that their claims against the insured will be paid.  Thus, the insurer essentially functions as a surety relative to the insured's ability to pay covered third-party claims.

Mark W. Flory & Angela Lui Walsh, *Know Thy Self-Insurance (And Thy Primary and Excess Insurance)*, 36 Tort & Ins. L.J. 1005, 1006-07 (2001).  Fronting policies typically involve either a deductible or a self-insured retention where the insured retains the responsibility to make payments up to a specified amount for defined costs, before the insurer's obligations to pay such costs are triggered.  *Id.* at 1007.

(Footnote continued on next page.)

A.     **The National Union Insurance Policies**

Each Program year consists of a general commercial liability policy in addition to other documents.   National Union issued commercial general liability policies (the "National Union Policies") annually to Valspar, which provided coverage from May 1, 1990, through May 1, 2004.  (National Union Answer ¶ 9, May 4, 2009, Docket No. 11; Second Quast Aff. ¶ 29.)[6]  Each Policy contains two provisions that are directly relevant to this dispute.  First, the Policies provide that National Union "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and that National Union "**will have the right and duty to defend any 'suit' seeking those damages**."  (*See, e.g.*, Second Quast Aff., Ex. 1 at 0183,[7] Ex. 6 at 0365 (emphasis added).)  Second, the Policies provide that "[t]his policy contains all the agreements between [Valspar and National Union] concerning the insurance afforded.  [Valspar] is authorized to make changes in the terms of this policy with [National Union's] consent.  This policy's terms can be amended or waived only by endorsement issued by [National Union] and made a part of this policy." (*Id.*, Ex. 1 at 0180, Ex. 6 at 0363.)

_____
(Footnote continued.)

[6] The National Union Policy for the 1998-1999 Program year does not appear in the record.  The parties do not dispute, however, that the 1998-1999 Policy contained language substantively identical to the provisions found in the National Union Policies that are in the record.

[7] The Program documents were produced under seal as exhibits to the Second Quast Affidavit with only Bates numbering.  Therefore, the Court will refer to the page number of a particular exhibit as the last four digits of the Valspar Bates numbering.

### B.     The Gallagher Service Agreement

When the Program began, National Union entered into an agreement with Gallagher Basset Services, Inc. ("Gallagher") whereby Gallagher contracted to act as National Union's general liability claims adjuster.  (*See* Decl. of Thomas Long, Ex. D, Jan. 11, 2010, Docket No. 79.)  Pursuant to the claims adjustment agreement, Gallagher agreed to, among other things, prepare and maintain files for the defense of claims and other litigation; pursue possibilities of subrogation, contribution, and indemnity on behalf of National Union and Valspar; adjust, resist, and/or settle claims; and pay all claims and defense expenses on behalf of Valspar, pursuant to National Union's obligations under the Policies.  Only the claims adjustment agreements for claims arising under the 1990-1991 and 1991-1992 Program years appear in the record.  (*Id.*, Exs. D, F.)  The parties agree, however, and other record evidence indicates that the relationship between National Union and Gallagher continued throughout the duration of the Program.  (*See* Second Quast Aff., Ex. 35 at 1631; Fifth Aff. of John P. Fischer, Ex. 1 (Dep. of Kristen Quast ("Quast Dep.") 70:12-24), July 5, 2012, Docket No. 201.)

### C.     The 1990-1991[8] Through 1992-1993 Program Years  (Indemnity Agreement)

The first three Program years consist annually of: (1) a National Union Policy; (2) an Indemnity Agreement[9]; (3) a Policy and Funding Schedule; and (4) a Promissory

---

[8] Each Program year is associated with the issuance of a single National Union Policy, and therefore runs for twelve months, beginning in May.  In this Order the Court will refer to the Program year by the dates of the year's corresponding Policy.  For example, the 1990-1991 Program year refers to the Program when the May 1990-May 1991 National Union Policy was in effect.

Note.   The National Union Policies[10] for the first three Program years are standard commercial general liability policies containing the language described above regarding National Union's duty to defend and amendments to the Policy being accomplished only through endorsements.   The Policies for the first three Program years do not contain any language regarding the use of a deductible or retention for general liability coverage, and nowhere eliminate the language placing the duty to defend on National Union.   The Indemnity Agreements that form part of the first three Program years obligate Valspar to reimburse National Union for certain costs incurred in insuring Valspar.   The Policy and Funding Schedules list information on premiums, claim administration, and Valspar's applicable retention for each Program year.   (*See* Second Quast Aff., Exs. 5, 9, 13.)   A Promissory Note for each Program year is attached to the Policy and Funding Schedule and acts as collateral for Valspar's obligation to reimburse National Union for costs

---

(Footnote continued.)

[9] The Indemnity Agreement for the 1990-1991 Program year is unexecuted.   (Second Quast Aff., Ex. 3.)   Additionally, the Indemnity Agreement for the 1991-1992 Program year is missing from the record, although other documents from the record make reference to such an agreement.   (*See* Second Quast Aff., Ex. 8.)   The parties do not appear to dispute, despite their absence from the record, that Indemnity Agreements identical or nearly identical to the unexecuted Indemnity Agreement from the 1990-1991 Program year were in effect between 1991 and 1993.   (*See* Long Decl. ¶¶ 10-11.)   Additionally, the 1990-1991 Indemnity Agreement states that it governs "all renewals" of the 1990-1991 Policy.   (Second Quast Aff., Ex. 3 at 1995.)   The Policies issued in Program years 1990-1991 through 1996-1997 are renewals of the previous year's policy.   (*Id.*, Ex. 6 at 0361, Ex. 10 at 0541, Ex. 14 at 0642, Ex. 18 at 0881, Ex. 20 at 0986, Ex. 23 at 1170.)   Therefore, even if a new Indemnity Agreement was not issued in Program year 1991-1992, the terms of the 1990-1991 Indemnity Agreement would govern Program year 1991-1992 because the 1991-1992 Policy is a renewal of the 1990-1991 Policy.

[10] Program years 1990-1991 through 1993-1994 each contained two commercial general liability policies – one of which was applicable only to Texas, and the other which was applicable in all other states.   The differences between the Texas policy and the policy governing all other states are not relevant to the present dispute.   References to the National Union Policies during the first three Program years refer to the Policies issued that were applicable to all states other than Texas.

identified in the Indemnity Agreement. (*Id.*, Exs. 5, 9, 13; *see* Quast Dep. 254:7-12.) Neither the Policy and Funding Schedules nor the Promissory Notes mention a duty to defend.

Valspar characterizes the Indemnity Agreement as "the controlling document of the [P]rogram." (Quast Dep. 258:21-24.) With respect to the scope of the Program, the Indemnity Agreements provide:

> [National Union] will issue the insurance policies listed in the Schedule(s). Such policies and all renewals thereof are governed by this Agreement and are referred to herein as the "Policy(ies)". This Agreement, together with the Schedule(s) and Policy(ies), constitute the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force. Unless otherwise agreed, should the parties later adopt revised or different Schedule(s) or should renewals of the Policy(ies) be issued, such Schedule(s) and Policy(ies) shall be subject to this Agreement and be part of the Program.

(*See, e.g.*, Second Quast Aff., Ex. 3 at 1995.)[11]

With respect to costs incurred in insuring Valspar, The Indemnity Agreements obligate Valspar to "indemnify [National Union] against and Reimburse it in full for each Reimbursable Loss." (*Id.*, Ex. 3 at 1996.) Losses refer to National Union's duty to indemnify claimants under the National Union Policies and are defined as "the obligations of [National Union] to pay claimants pursuant to the Policy(ies)." (*Id.*, Ex. 3 at 1995.) "Where a loss is within the limits of liability of a Policy, 'Reimbursable Loss' shall mean the smaller of the Loss or the applicable Retention Limit(s). Should a Loss exceed the limits of liability of a Policy, 'Reimbursable Loss' shall mean the entire Loss payment minus [National Union]'s Retention." (*Id.*) National Union's Retention refers

---

[11] The Indemnity Agreements for the first three Program years that appear in the record are largely identical. (*See* Long Decl. ¶¶ 10-11; *see, e.g.*, Second Quast Aff., Ex. 12.)

to "that coverage for loss provided by the Policy(ies) in excess of the Retention Limits up to the limits of liability of the Policy(ies)." (*Id.*)

To understand how the Indemnity Agreements operate with respect to reimbursable losses, it is helpful to consider actual numbers. The 1990-1991 Policy has a general liability limit of $2 million per occurrence. (*Id.*, Ex. 5 at 0002.) The retention limit during the 1990-1991 Program year for general liability is $250,000 per occurrence. (*Id.*)[12] If an event occurs triggering liability insurance, and National Union settles the claim for $1 million (within the liability limit), Valspar would be required to reimburse National Union $250,000 (the lesser of the loss and the applicable retention limit). If an event occurs triggering liability insurance, and National Union settles the claim for $3 million (outside the liability limit), Valspar would be required to reimburse National Union $1.25 million (the entire loss minus National Union's retention – defined as the amount of liability coverage in excess of the retention limit, or $1.75 million).

The Indemnity Agreements also impose certain obligations regarding costs incurred in defending Valspar, providing that Valspar "will indemnify [National Union] and Reimburse it in full for Allocated Loss Expenses" in a manner based on specified application of the retention limits. (*Id.*, Ex. 3 at 1996.) The Indemnity Agreements define Allocated Loss Expenses as:

> all court costs and court expenses; pre- and post-judgment interest; fees for service of process; attorneys' fees; cost of undercover operative and detective services; costs of employing experts; costs for legal transcripts; costs for copies of any public records; costs of depositions and court-reported or recorded statements; costs and expenses of subrogation and any

---

[12] Although the retention limits increased in subsequent Program years, the basic operation of the Indemnity Agreements did not. (*See* Second Quast Aff., Ex. 9 at 0311, Ex. 13 at 0484.)

similar fee, cost or expense reasonably chargeable to the investigation, negotiation, settlement or defense of a claim or loss or to the protection and perfection of the subrogation rights of the Company and/or of the Client. "Allocated Loss Expenses" shall not mean fees for attorneys who are employees of the Company or on permanent retainer.

(*Id.*)[13] Specifically, the Agreements state that

1) if Reimbursable Loss is contained within the Retention Limit(s) – [Valspar] will pay all Allocated Loss Expenses; 2) if Reimbursable Loss exceeds the Retention Limit(s) – [Valspar] will pay that amount of Allocated Loss Expenses that is in proportion to the ratio that the Retention Limit(s) bears to the Loss paid under the Policy(ies); or 3) if there is no Reimbursable Loss – [Valspar] will pay all allocated Loss Expenses up to the Retention Limit(s) and fifty percent (50%) of the Allocated Loss Expenses which exceed the Retention Limit(s).

(*Id.*)

Again, an example considering the actual numbers from Program year 1990-1991 is useful to understand the operation of the Indemnity Agreements with respect to defense costs. Under the first scenario described in the Indemnity Agreements, if National Union settles a claim under the 1990-1991 Policy for $150,000, and spends $50,000 on defense costs, Valspar would be required to reimburse National Union the entire $50,000 because the claim was within the Retention Limit. Under scenario two, if National Union instead settles a claim for $500,000, still spending $50,000 on defense costs, Valspar would be required to reimburse National Union only $25,000, representing half of the defense

---

[13] In later iterations of the Program, Allocated Loss Expenses became known as Allocated Loss Adjustment Expenses. (*See* Second Quast Aff., Ex. 32 at 1623.) Throughout the Program years, however, these expenses were defined almost identically. Because Allocated Loss Expenses or Allocated Loss Adjustment Expenses essentially comprise costs incurred in defending Valspar, this Order will refer to such expenses where they are referenced in various Program documents as "defense expenses."

costs, because the Retention Limit was half of the total loss paid under the Policy.[14]

Finally, under scenario three if National Union spends $50,000 on defense costs, and

never pays out to a claimant under the Policy, Valspar would be required to reimburse

National Union for the entire $50,000 (as it is within the Retention Limit).

The Indemnity Agreements define Valspar's reimbursement obligation as "the

obligation of [Valspar] to forward funds to [National Union] for the purposes of:

(i) Reimbursing [National Union] for payments already made to third parties which are

reimbursable under this Agreement; or (ii) putting [National Union] in funds for

payments to be made immediately to third parties and reimbursable under this

Agreement." (*Id.*, Ex. 3 at 1996.)  Finally, the Indemnity Agreements provide that "[a]ny

recitals in this Agreement of the terms and provisions of the Policy(ies) are merely

descriptive and [Valspar] is indemnifying, to the extent and in the amounts herein

provided, the obligations of [National Union] under the Policy(ies)." (*Id.*)

---

[14] Prior to her deposition, Valspar's corporate representative produced a document she had prepared listing Valspar's retention or deductible in a given year and identifying Valspar's obligation for paying defense costs in each Program year. (Quast Dep. 13:3-14; Fourth Aff. of John P. Fischer, Ex. 1 at 25, May 31, 2012, Docket No. 190.)  The document reflects an understanding of the Program's operation that appears to be unsupported by the actual Program documents.  For example, the document states that in the 1990-1991 Program year Valspar was responsible for reimbursing National Union for all defense costs, regardless of the retention limit or amount of loss from a particular claim.  (Fourth Fischer Aff., Ex. 1 at 25.)  As described above, however, pursuant to the Indemnity Agreements Valspar's obligation to reimburse National Union for defense costs was clearly subject to several limitations based on the amount of loss paid by National Union and Valspar's retention limit in the 1990-1991 Program year. (Second Quast Aff., Ex. 3 at 1996.)  Because the summary prepared by Quast does not appear to be an accurate description of the Program documents, the Court has relied on the documents themselves in describing the Program.

**D.     The 1993-1994 and 1994-1995 Program Years (Indemnity Agreement and Deductible Endorsement)**

For years 1993-1994 and 1994-1995, the Program is largely the same as the first three years and consists annually of (1) a National Union Policy; (2) an Indemnity Agreement; (3) a Policy and Funding Schedule; and (4) a Promissory Note.  However, the National Union Policies in these Program years contain a Deductible Liability Insurance Endorsement (the "Deductible Endorsement") that modifies National Union's coverage obligations.  (Second Quast Aff., Ex. 14 at 0698, Ex. 18 at 0898.)

The Deductible Endorsements apply to Valspar's commercial general liability and products liability coverage, and state that National Union's "obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on [Valspar's] behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above." (*Id.*, Ex. 14 at 0698, Ex. 18 at 0898.)  The deductible amount in both Program years is $2,000,000 per occurrence.  (*Id.*, Ex. 14 at 0698, Ex. 18 at 0898.) With respect to a duty to defend, the Deductible Endorsements state that:

> The terms of this insurance, including those with respect to:
>
> (a)   [National Union's] right and duty to defend any 'suits' seeking [damages to which this insurance applies]; and
>
> (b)   [Valspar's] duties in the event of an "occurrence", claim, or "suit
>
> apply irrespective of the application of the deductible amount.

(*Id.*, Ex. 14 at 0699, Ex. 18 at 0899.)   Finally, under the Deductible Endorsements National Union reserves its right to "pay any part or all of the deductible amount to effect settlement of any claim or 'suit' and, upon notification of the action taken, [Valspar] shall

promptly reimburse [National Union] for such part of the deductible amount as has been paid by [National Union]." (*Id.*, Ex 14 at 0699, Ex. 18 at 0899.)

Other than the Deductible Endorsements, the documents comprising the 1993-1994 and 1994-1995 Program years are largely identical to the documents contained in the first three Program years. The only notable change to the 1993-1994 Indemnity Agreement is an amendment to replace reference to "Retention Limits" with "Retention Limits and/or Deductible Amounts." (Second Quast Aff., Ex. 16 at 2155.)[15] Additionally, the Retention Limits for liability insurance were increased to $2,000,000, matching the deductible limits from the Endorsements. (*Id.*, Ex. 17 at 2158, Ex. 19 at 0953.)[16]

### E. The 1995-1996 Through 1999-2000 Program Years (Payment Agreement, Large Risk Rating Plan, and Deductible Endorsement)

Beginning in the 1995-1996 Program year, the Program consists annually of (1) a National Union Policy; (2) a Payment Agreement; and (3) a Schedule of Policies and Payments. The National Union Policies included in the 1995-2000 Program years

---

[15] The Indemnity Agreement for the 1994-1995 Program year also appears to be missing from the record. Again, however, the parties do not appear to dispute that an Indemnity Agreement identical, or nearly identical, to the Indemnity Agreement from the 1990-1991 Program year was in effect in the 1994-1995 Program year. Additionally, pursuant to the original Indemnity Agreement which states that it governs "all renewals" of the 1990-1991 Policy, the terms of the 1990-1991 Indemnity Agreement (with the 1993-1994 amendments) would govern Program year 1994-1995 because the 1994-1995 Policy was a renewal of the 1990-1991 Policy.

[16] Neither Valspar nor National Union explained how the deductible amount in the Deductible Endorsements and the retention limits of the Indemnity Agreements interacted. It is unclear, for example, whether the reimbursement scheme of the Indemnity Agreements would continue to apply after Valspar had reimbursed National Union for the entire deductible amount. For the reasons explained below, it is immaterial to the resolution of this dispute how exactly the retention limits and deductible amounts interacted.

contain a Deductible Endorsement and a Large Risk Rating Plan Endorsement.   The Deductible Endorsements in the 1995-1996 through 1999-2000 Program years are identical to the Deductible Endorsements from the 1993-1994 and 1994-1995 Program years.  (*See, e.g.*, Second Quast Aff., Ex. 20 at 0991-0992, Ex. 23 at 1201, Ex. 25 at 1346.)

The Large Risk Rating Plan Endorsements ("the Large Risk Endorsements") set forth complicated formulas regarding the premiums Valspar is required to pay to National Union.  (*See, e.g.*, Second Quast Aff., Ex. 21, Ex. 23 at 1221-29, Ex. 25 at 1362-72.)  The Large Risk Endorsements base Valspar's premium in part on National Union's "Incurred Subject Losses."  (*Id.*, Ex. 21 at 1156.)  Incurred Subject Losses mean the "amounts [National Union] become[s] obligated under the terms of the policy to pay as damages, benefits or indemnify . . . because of an occurrence, accident, claim or suit" within the liability limits."  (*Id.*, Ex. 21 at 1157-1158.)  Incurred Subject Losses also include "all costs, fees and expenses [National Union] incurs in [its] investigation, negotiation, settlement or defense of claims or suits against [Valspar]."  (*Id.*, Ex. 21 at 1158.)   In calculating Valspar's premium, National Union reduces the Incurred Subject Loss amount, by any amount that Valspar "must reimburse [National Union] under any . . . 'Deductible' terms that are part of the policy or an endorsement to the policy."  (*Id.*, Ex. 21 at 1156.)

The Payment Agreements essentially replace the Indemnity Agreements that governed the first five Program years.  (*See, e.g.*, Second Quast Aff., Exs. 22, 24.)  The Payment Agreements prior to the 1998-1999 Program year ("the Pre-1998 Agreements") state that National Union has "assumed certain of [Valspar's] risks of loss under the

insurance policies." (Second Quast Aff., Ex. 22 1146.)   The Pre-1998 Agreements also direct Valspar to pay to National Union "the deductible or reimbursable portions of all losses that [National Union] pays on [Valspar's] behalf under such Policies as are subject to deductible or loss reimbursement terms."   (*Id.*)   Finally, the Pre-1998 Agreements include a promissory note, providing collateral for Valspar's payment obligations.   (*Id.*, Ex. 22 at 1148, 1153.)

Beginning in the 1998-1999 Program year, the Payment Agreements state that National Union agrees "to provide [Valspar] insurance and services according to the Policies" and also agrees to defer its demand "for full payment" of Valspar's payment obligation if Valspar "make[s] partial payments according to this Agreement." (Ex. 28 at 1418.)   Pursuant to the Payment Agreements, Valspar agrees to pay National Union Valspar's Payment Obligation, and "provide [National Union] with collateral according to this Agreement." (*Id.*, Ex. 32 at 1623.)   Valspar's payment obligation is defined as:

> the amounts that [Valspar] must pay [National Union] for the insurance and services in accordance with the terms of the Policies, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof.   Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:
>
> - the premiums and premium surcharges,
>
> - *Deductible Loss Reimbursements,*
>
> - any amount that [National Union] may have paid on [Valspar's] behalf because of any occurrence, accident, offense, claim or suit with respect to which [Valspar is] a self-insurer,
>
> - any other fees, charges, or obligations as shown in the Schedule or as may arise as [Valspar and National Union] may agree from time to time.

(*Id.*, Ex. 32 at 1624 (italics original).)   Deductible Loss Reimbursements mean the portion of any loss (indemnity costs) or defense costs "[National Union] pay[s] that

[Valspar] must reimburse [National Union] for under any 'Deductible' provisions of a Policy." (*Id.*, Ex. 32 at 1623.)   During the 1995-1996 to 1999-2000 Program years, Valspar was only obligated, pursuant to the Deductible Endorsements, to reimburse National Union for losses, not defense costs, therefore Deductible Loss Reimbursements in those years refers only to the portion of indemnity costs paid by National Union that Valspar was required to reimburse.

> **F.    The 2000-2001 Through 2003-2004 Program Years (Direct Payment Agreement, Large Risk Rating Plan, and Deductible Defense Costs Endorsement)**

Beginning in the 2000-2001 Program year, the Program consists annually of (1) a National Union Policy; (2) a Direct Payment Agreement; and (3) a Schedule of Policies and Payments.   The National Union Policies included in the 2000-2001 through 2003-2004 Program years contain different Deductible Coverage Endorsements than the previous Program years ("the Deductible Defense Costs Endorsements") that specifically discuss the allocation of defense costs.   The Policies also include Large Risk Rating Plan Endorsements that are substantively the same as the Large Risk Endorsements described above.

The Deductible Defense Costs Endorsements define Valspar's reimbursement obligations.   The Endorsements state that National Union "will pay all sums that [it] become[s] obligated to pay up to [the] Limit of Insurance under the policy to which this endorsement is attached." (Second Quast Aff., Ex. 31 at 1612.)   Valspar is required to reimburse National Union "up to the Deductible Limit(s) shown in the Schedule for any amounts [National Union has] so paid as damages, benefits or Medical Payments." (*Id.*) With respect to defense costs, the Deductible Defense Costs Endorsements state that

Valspar "must reimburse" National Union for defenses costs up to the deductible limit.

In Program years 2000-2001 and 2001-2002 the most Valspar is required to reimburse

National Union for damages and defense costs combined "shall not exceed the deductible

amount." (*Id.*, Ex. 31 at 1612, Ex. 36 at 1676.)[17]  In Program years 2002-2003 and 2003-

2004, Valspar is required to reimburse National Union for all defense expenses without

limitation. (Second Quast Aff., Ex. 39 at 1863, Ex. 41 at 1967.)[18]  Finally, the Deductible

Defense Costs Endorsements state that "[t]his Endorsement applies solely between

[Valspar] and [National Union].  It does not affect the rights of others under this policy."

(*Id.*, Ex. 36 at 1676.)

Beginning in the 2000-2001 Program year, the Payment Agreements are largely

identical to the Payment Agreement adopted in 1998-1999, except for the incorporation

of a direct payment addendum (collectively, "the Direct Payment Agreements").   The

Direct Payment Agreements state that National Union has retained the services of

Gallagher "to serve as a third party administrator, adjusting claims on [National Union's]

behalf for [Valspar's] benefit.  (Second Quast Aff., Ex. 35 at 1631.)  The Direct Payment

Agreements then describe the pre-2000 status of National Union and Valspar's

relationship, stating that

> [National Union] bear[s] the responsibility to: 1) make payment to
> [Gallagher] of all fees for Claims Adjusting Services . . . and 2) provide
> [Gallagher] with the funds necessary to enable [Gallagher] to pay
> [Valspar's] share of losses and [defense expenses] (hereinafter collectively

---

[17] The Deductible in both of these Program years is $1,000,000.  (Second Quast Aff., Ex. 31 at 1614, Ex. 36 at 1678.)

[18] The Deductible in Program year 2002-2003 is $2,000,000 (Second Quast Aff., Ex. 39 at 1865) and the Deductible in Program year 2003-2004 is $5,000,000 (*id.*, Ex. 41 at 1967).

referred to as "Losses").   (Losses and Fees will be referred to collectively as "Obligations")[.]

(*Id.*)   The Direct Payment Agreements state that Valspar "desire[s] to assume direct responsibility for the payment of all Obligations," and National Union "agree[s] to allow [Valspar] to assume the responsibility for payment of all Obligations while [National Union] continue[s] to guarantee [Valspar's] fulfillment of those Obligations."  (*Id.*)  To effectuate the parties' intentions, the Direct Payment Agreements provide that Valspar "agree[s] to assume all Obligations to make payments of Fees and Losses due to [Gallagher] upon receipt of either [National Union's] statement or [Gallagher's] statement therefor."  (*Id.*)

The Direct Payment Agreements apply "to any policies and Schedules that [National Union] may issue as renewals, revisions, replacements or additions to the attached Schedule and the Policies listed there."  (*Id.*, Ex. 32 at 1623.)  The schedule for Program year 2000-2001 produced by Valspar (issued contemporaneously with the Direct Payment Agreement) is missing a page and lists no Policies to which the Direct Payment Agreement is applicable.  (*Id.*, Ex. 33 at 1633-34.)  The same schedule produced by Continental in support of its motion, indicates that the only Policy to which the 2000-2001 Direct Payment Agreement is applicable is the 2000-2001 Policy.  (Third Decl. of Karen Ventrell, Ex. E at 3, May 31, 2012, Docket No. 193.)  The Direct Payment Agreement schedule for Program year 2001-2002 lists the policies governed by the Direct Payment Agreement as those corresponding to Program year 2000-2001 and 2001-2002. (*Id.*, Ex. 37 at 1764; *see* Ex. 31 at 1538, Ex. 36 at 1652.)  The schedules for 2002-2003 and 2003-2004 list only the policies issued in those Program years as being subject to the Direct Payment Agreement.  (*Id.*, Ex. 40 at 1872, Ex. 42 at 1975.)

In the definition of Valspar's payment obligations under the Agreement, the Direct Payment Agreement specifies that it controls "the amounts that [Valspar] must pay [National Union] for the insurance and services in accordance with the terms of the Policies, this Agreement, and any similar primary casualty insurance policies and agreements with [National Union] incurred before the inception date hereof." (*Id.*, Ex. 32 at 1624.)   Finally, the Direct Payment Agreement defines "policies" as "any of the insurance policies described by their policy numbers in the Schedule, and their replacements and renewals," and/or "any additional insurance policies that [National Union] may issue to [Valspar] that [Valspar] and [National Union] agree to make subject to this Agreement." (*Id.*, Ex. 32 at 1623.)

## G.      The National Union Program in Practice

Valspar claims that if an underlying lawsuit alleges exposure to Valspar's products beginning after May 1, 1990, thereby triggering coverage only under the Program years, Valspar funds its own defense up to the limit of the applicable deductible or retention. (Second Quast Aff. ¶ 11; Quast Dep. 203:14-18.)   Valspar contends, however, that when an underlying lawsuit alleges exposure both before and after May 1, 1990, thereby triggering coverage of other historical insurers as well as the National Union Program years, neither Valspar nor National Union has paid defense costs.   (Second Quast Aff. ¶ 22; Quast Dep. 110:3-8.)   Instead, Valspar alleges that the defense in such cases has been funded by the other historical insurers.[19]   (Second Quast Aff. ¶ 22.)   Some record

---

[19]   Valspar produced an affidavit to demonstrate National Union's and its own commitment to not paying defense costs for claims that triggered coverage of other historical insurers.   (*See* Third Aff. of Logan Mitton, July 5, 2012, Docket No. 202.)   For example, Valspar

(Footnote continued on next page.)

evidence suggests, however, that on at least some occasions when an underlying lawsuit triggered both coverage of historical insurers as well as coverage under the National Union Program, National Union has agreed with other historical insurers to contribute to Valspar's defense.  (*See* Third Ventrell Decl., Exs. F-G.)

Valspar's corporate representative testified that at least during the 1990-1991 through 1994-1995 Program years, when a lawsuit triggered coverage only under the Program years, National Union would pay all defense expenses on behalf of Valspar out of an account funded by Valspar.  (Quast Dep. 19:1-17, 230:5-9, 231:4-21.)  After paying defense costs, National Union would then bill Valspar to replenish the account.  (*Id.*)  Valspar alleges that since 2000, however, Gallagher, not National Union manages an account funded by Valspar to pay defense expenses within the applicable deductible or retention on behalf of Valspar.  (*Id.*, 235:9-23.)  Valspar also alleges that when claims arise under the Program years Valspar "selects and engages defense counsel; negotiates rates and other terms of engagement; reviews and approves defense counsel's invoices; selects, implements, and directs defense strategy; selects, implements, and directs

_____

(Footnote continued.)

produced several lists of lawsuits filed against Valspar in which other historical insurers, not Valspar or National Union, allegedly paid for defense costs.  (*Id.* ¶¶ 3-5, Exs. A-C.)  Because neither these lists of suits nor their accompanying affidavit contain any indication of when the suits were filed, or the period of exposure alleged in the suits, it is impossible for the Court to determine whether the Program years were triggered at all by these lawsuits.  The exhibits are therefore unhelpful in determining how Valspar and National Union actually operated the Program with respect to defense costs.  Moreover, the affidavit admits that the lists are only a "partial listing" of such suits, indicating that other similar suits existed, in which defense costs may have been allocated differently.  (*Id.* ¶¶ 3-5.)  At most the affidavit and accompanying exhibits indicate that, in its corporate history, some lawsuits have existed for which neither Valspar nor National Union paid defense costs – information that is not nearly dispositive of the issues at hand.

settlement strategy; and funds settlements up to the limit of the applicable deductible or self-insured retention."  (Second Quast Aff. ¶ 11.)

With respect to providing notice of underlying lawsuits, the record indicates that up until at least 2006, when an underlying suit triggered coverage by historical insurers and the National Union Program years, Valspar would give notice and tender the matter for defense to National Union along with other historical insurers.  (*See* Decl. of Kevin S. Horwitz, Exs. C-O, Jan. 25, 2010, Docket Nos. 102-09.)   By giving notice and tendering the matter "to provide Valspar with a complete defense," (*id.*, Ex. L at 2, Docket No. 109), Valspar alleges that it did not intend that National Union would pay for defense costs (*see, e.g.*, Quast Dep. 104:15-18, 106:17-19, 145:2-7.)   After 2006, Valspar sometimes did not include National Union on its notice and tender letters sent to other historical insurers.  (*See*  Third Aff. of Logan Mitton, Exs. E-Z, July 5, 2012, Docket No. 202.)

## III.    THE UNDERLYING TOXIC TORT LAWSUITS

The present dispute arises out of four actions filed against Valspar by individuals alleging exposure to benzene from products manufactured or sold by Valspar.  (Compl. ¶¶ 15, 18, 21, 24.)  The *Diorio*, *Pilling*, and *West* actions were filed in 2005 and the *Rush* action was filed in 2006.  (Second Decl. of Karen Ventrell, Ex. A at 1, Ex. B at 42, Ex. C at 1, Ex. D at 28, Jan. 25, 2010, Docket Nos. 110-11.)[20]  The parties agree that these four

---

[20] The exhibits to the Second Ventrell Declaration and the declaration itself were filed under separate docket numbers – Docket Numbers 110 and 111, respectively.  The exhibits are referred to in the declaration and labeled as A-D, but were filed in two separate documents. Exhibits A-B can be found in Docket Number 111, whereas Exhibits C-D can be found in Exhibit 1, attached to Docket Number 111.  This Order refers to the exhibits by the alphabetical

(Footnote continued on next page.)

lawsuits triggered obligations for all of Valspar's historical insurers, as the complaints alleged exposure to and injury from benzene beginning, at the latest, in 1966, and extending through at least May 1990.  (*Id.*, Ex. A at 6, Ex. B at 45, Ex. C at 4, Ex. D at 36-38.)

## A.    Notification of Insurers

Valspar notified its historical insurers, including Continental and Gallagher (the third party administrator of the National Union Program years), and tendered the four underlying lawsuits for a complete defense from all insurers.  (Compl., Exs. C-J, Feb. 9, 2009, Docket No. 2.)[21]   In total, Valspar tendered defense to six primary insurers, one umbrella insurer, and one excess insurer.  (*See, e.g.*, Ex. D; Third Aff. of John P. Fischer, Ex. A (Dep. of Kevin S. Horwitz ("Horwitz Dep.") 56-57), Mar. 22, 2010, Docket No. 127.)  This means that Valspar sent letters containing copies of the complaint in each underlying lawsuit to all of its historical insurers.  (Compl., Exs. C, E, G, I.)  In the letters, Valspar stated it was "tendering this matter to the carriers listed on the attached 'Schedule A' to provide Valspar with a complete defense, and to otherwise fulfill your policy obligations."  (*See, e.g.*, *id.*, Ex. C at 2.)  Schedule A for all four underlying lawsuits listed National Union Policies issued during the Program years.  (*See id.*, Exs. D, F, H, J.)  Continental determined it had a duty under the Continental Policies to defend

_____

(Footnote continued.)

denotation used in the original declaration.  The pages cited to for each exhibit refer to the electronic filing system pagination.

[21] All exhibits to the complaint were filed as a separate document from the complaint itself and can be found in Docket No. 2.

the underlying suits.  (Horwitz Dep. 42:1-3; Second Quast Aff. ¶ 3, Supplemental Aff. of

Kristen Quast, Exs. A-D, July 12, 2012, Docket No. 213.)   Subject to a reservation of

rights, Continental agreed to allow Valspar to retain its own independent counsel and

agreed to reimburse Valspar for its defense payments incurred in defending against the

underlying actions.  (First Decl. of Karen Ventrell, Ex. 1 at 2, Sept. 15, 2009, Docket No.

35; Supp. Quast Aff., Exs. A-D.)

Continental specifically requested contribution to Valspar's defense from National

Union, which National Union declined to provide.  (Compl., Ex. K.)   According to the

record, the only other response from National Union related to the underlying lawsuits

came in response to notification from Valspar of the *Rush* suit.  In a letter to Valspar,

National Union explained that because the National Union policies "are part of a self-

insured, fronting arrangement of primary liability insurance," and because Valspar had

not exhausted its retention amounts "National Union['s] obligations are not implicated at

this time."  (Second Quast Aff., Ex. 43 at 5592.)

### B.     Loan Receipt Agreement

After Valspar tendered defense to Continental in connection with the four

underlying lawsuits, Valspar and Continental entered into an Interim Loan Receipt and

Defense Cost Agreement (the "Loan Receipt Agreement").  (First Ventrell Decl., Ex. 1 at

2.)  The Loan Receipt Agreement provides that, with respect to the four underlying

lawsuits:

> 1.  Continental will review all invoices for defense costs presented to it for
>     advancement of reasonable and necessary defense costs incurred in
>     connection with the Underlying Actions in accordance with
>     Continental's Litigation Guidelines previously provided to Valspar.
>     Continental agrees to advance to or on behalf of Valspar in the form of a

nonrecourse non-interest bearing loan reasonable and necessary defense costs incurred by or on behalf of Valspar in the Underlying Actions.

2. Continental will provide Valspar with a chart of any deductions for costs which Continental believes do not constitute reasonable and necessary defense costs incurred in connection with the Underlying Actions.

3. Valspar reserves the right to challenge any deductions Continental makes with respect to such defense costs.

4. Continental agrees not to seek recovery from Valspar for defense costs advanced by Continental in connection with the Underlying Action and agrees to waive any right of recovery from Valspar for such costs.

5. The parties agree that all other rights under the policies and/or applicable law are hereby reserved.

(*Id.*)

## C.    Payment of Defense Costs

In its initial brief Continental claimed that it has paid a total of $538,920.94 in costs to defend Valspar in the four underlying actions: *Pilling* ($60,369.36), *Diorio* ($306,167.70), *West* ($2,212.35), *Rush* ($170,171.53).  (Pl.'s Mem. in Supp. of Summ. J. at 16, May 31, 2012, Docket No. 192.)  In the final reply brief filed with respect to the cross-motions for summary judgment, Continental submitted an invoice indicating that it has paid a total of $551,060.21 in defending Valspar: *Pilling* ($75,090.04), *Diorio* ($282,709.03), *West* ($2,212.35), *Rush* ($191,048.79).[22]  (Decl. of Wayne Binowski, Ex. A, July 12, 2012, Docket No. 215.)

Valspar alleges that Continental has failed to properly pay legitimate defense costs in the *Rush* action.  Valspar hired independent counsel to defend it in the four underlying

---

[22] *Rush* and an action referred to as *LaForce* were at one time combined.  Therefore the invoices submitted by both parties contain reference to a *LaForce* action.  *LaForce* payments have been included in the *Rush* totals.

lawsuits, and then submitted invoices of defense costs to Continental for reimbursement. Valspar contends that Valspar attorneys incurred at least $184,000 in defending *Rush*. (Second Quast Aff. ¶ 25.)  Valspar also claims that it has not received reimbursement of more than $15,800 from that suit.   (*Id.*)   Valspar has submitted an invoice of Continental's payments in *Rush* in support of these claims.  (Aff. of Angela Woodall, Ex. A, July 12, 2012, Docket No. 212.)  Valspar contends that Continental refused to pay reasonable attorney hourly rates, has not paid for online research and certain paralegal work, and made late payments on numerous invoices.  (Second Quast Aff. ¶¶ 27-28.) The invoice of *Rush* payments contains none of these details, and only indicates that Continental has not paid $15,800 of the $184,000 in defense costs submitted by Valspar, but provides no indication of why these amounts were not paid.  (Woodall Aff., Ex. A.) The invoice also indicates that Valspar appealed the denial of certain defense costs, some of which denials were reversed by Continental after which Continental reimbursed Valspar for those costs.  (*Id.*)  The invoice contains no information regarding the reason for appeal or reimbursement.

## IV.   PROCEDURAL HISTORY

In February 2009, Continental filed a complaint against National Union, seeking contribution for the costs incurred by Continental in paying for Valspar's defense  against the underlying actions.  In its complaint, Continental sought "a judicial declaration that National Union has a duty to defend Valspar" and "a judicial declaration that Continental has a right of contribution and is entitled to contribution from National Union for defense expenses advanced by Continental to or on behalf of Valspar in connection with the Underlying Actions in an amount to be determined at trial."  (Compl. at 10.)

Valspar brought a motion to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2). (Mot. to Intervene, July 21, 2009, Docket No. 20.) In support of its motion, Valspar argued that intervention was necessary to protect its interest because any contribution obligation of National Union would ultimately be borne by Valspar pursuant to the Program. (Valspar's Mem. in Supp. of Mot. to Intervene, July 21, 2009, Docket No. 22.) The Magistrate Judge granted Valspar's motion. (Order, Sept. 1, 2009, Docket No. 30.)[23]

This case was previously before the Court on Continental's motion for judgment on the pleadings or, in the alternative, summary judgment. The Court rejected the Magistrate Judge's recommendation that Continental's motion for judgment on the pleadings be granted, determining that because the Magistrate Judge had relied on materials outside of the pleadings, the motion should have been considered as one for summary judgment. (Order, Sept. 30, 2010, Docket No. 153.) The Court further found that under Fed. R. Civ. P. 56(f) (now 56(d)), additional fact discovery was necessary prior to a decision on the merits at summary judgment, and declined to grant summary judgment in favor of either National Union or Valspar. (Order at 12-13.)

---

[23] National Union also brought crossclaims against Valspar seeking a declaration of Valspar's obligations under the Program, and alleging that Valspar anticipatorily breached the Program by entering into the Loan Receipt Agreement and failing to acknowledge its obligations under the Program. (Crossclaims, Jan. 11, 2010, Docket No. 83.) Although none of the parties have brought any motions with respect to the crossclaims, some of the issues resolved in this Order clearly bear upon resolution of the crossclaims. Because none of the parties have requested any action related to the crossclaims, the Court will not speculate upon the extent to which this Order has resolved certain portions of those claims.

The case is now before the Court on National Union and Valspar's[24] cross motions for summary judgment.  Additionally, National Union seeks judgment independent of a motion pursuant to Fed. R. Civ. P. 56(f)(1).

## ANALYSIS

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     DUTY TO DEFEND UNDER THE NATIONAL UNION PROGRAM YEARS

Under Minnesota law, "[a] primary insurer that has a duty to defend, and whose policy is triggered for defense purposes, has an equitable right to seek contribution for

---

[24] As an initial matter, the Court notes that it may properly consider Valspar's motion for summary judgment, even though Valspar is not a party named in the complaint. *See Alvarado v. J.C. Penney Co.*, 997 F.2d 803, 805 (10th Cir. 1993) (granting an intervenor's request for declaratory relief, even where the intervenor was not named in the complaint); *see also Yoshiya Props. Inc. v. Sutton E. Assocs. No. 88*, 603 N.Y.S.2d 479, 480 (N.Y. App. Div. 1993) (noting that after intervening and interposing an answer, the status of an intervening party "is not different from that of any other party").

defense costs from any other insurer **who also has a duty to defend** the insured, and whose policy has been triggered for defense purposes." *Cargill, Inc. v. Ace Am. Ins. Co.*, 784 N.W.2d 341, 354 (Minn. 2010) (emphasis added). Therefore, in order to determine whether Continental may seek contribution for defense costs expended in the four underlying lawsuits, the Court must first determine which entity, if any, owed a duty to defend Valspar under the National Union Program years.

An insurer typically owes two basic duties to its insured – a duty to indemnify and a duty to defend. *See Nelson v. Am. Home Assurance Co.*, 824 F. Supp. 2d 909, 915 (D. Minn. 2011). A duty to indemnify requires the insurer to pay those sums that the insured becomes legally obligated to pay as damages for any covered claim. *Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 616 (Minn. 2012). A duty to defend generally requires an insurer to defend against a claim brought against its insured, and is triggered if "any part of the claim against the insured is arguably within the scope of protection afforded by the policy." *Franklin v. W. Nat'l Mut. Ins. Co.*, 574 N.W.2d 405, 406-07 (Minn. 1998). The duty to defend is therefore broader than a duty to indemnify in three ways: "(1) the duty to defend extends to every claim that 'arguably' falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims." *Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006).

Additionally, the duty to defend is distinct from a mere obligation to pay for defense costs. The Minnesota Supreme Court has recognized that a duty to defend and reimbursement for defense expenditures are not synonymous, explaining that:

> The burden of litigation extends beyond the monetary costs of litigation and
> encompasses hiring attorneys and managing lawsuits. . . . [I]f an insurer
> breaches its duty to defend, the insured must do twice what it contracted to
> avoid: hire attorneys and manage a lawsuit for both the underlying case and
> the declaratory judgment proceeding.  In contrast, the agreement to
> reimburse the insured for defense costs . . . does not involve the promise to
> relieve the insured from the burdens of litigation.  The insured must still
> hire an attorney and manage the underlying litigation.  An agreement to
> reimburse the insured's defense costs is simply an agreement for the
> payment of money.

*In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 425 (Minn. 2003).  A duty

to defend and an obligation to reimburse are so distinct, in fact, that an insurer can

explicitly disclaim its duty to defend under an insurance policy while retaining a duty to

reimburse its insured for defense costs.  *See Liberty Mut. Ins. Co. v. Pella Corp.*, 650

F.3d 1161, 1172 (8th Cir. 2011).[25]

Finally, a duty to defend is imposed contractually.  *See Meadowbrook, Inc. v.

Tower Ins. Co.*, 559 N.W.2d 411, 415 (Minn. 1997).  As such, to ascertain which, if any,

entity had a duty to defend Valspar during the Program years, the Court must interpret the

Program documents.[26]  In the absence of ambiguity, the construction and interpretation of

---

[25] *See also Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp.
597, 603 (N.D. Cal. 1994) ("An insurer may assume a duty to reimburse for defense costs
without assuming a duty to defend.").

[26] As a preliminary matter, the parties dispute which documents may properly be
considered as part of the Program.  Valspar advances several theories under which all of the
documents produced as constituting the Program in a single year should be read together as a
single contract.  For example, Valspar argues that the Program documents in any given year all
refer to one another, were executed simultaneously as part of a single transaction, and should
therefore be construed as a single contract.  *See Anchor Cas. Co. v. Bird Island Produce, Inc.*, 82
N.W.2d 48, 54 (Minn. 1957) ("It is well established that where contracts relating to the same
transaction are put into several instruments they will be read together and each will be construed
in reference to the other.").  Continental argues, on the other hand, that because the Policies
provide that their terms "can be amended or waived only by endorsement issued by [National
Union] and made a part of this policy" the Court must determine that the non-Policy Program
documents are endorsements, before it may construe the documents as changing any part of the

(Footnote continued on next page.)

the Program is a question of law.  *Brookfield Trade Ctr., Inc. v. Cnty of Ramsey*, 584

N.W.2d 390, 394 (Minn. 1998).

### A.      Standing

As an initial matter the Court must determine whether Continental has standing to

seek a determination from the Court that National Union had a duty to defend Valspar

during the Program years.  Valspar and National Union seem to contend that Continental

lacks standing to seek such a determination because Continental is a stranger to the

contracts forming the Program.[27]

_____

(Footnote continued.)

Policies.  Valspar may also be arguing that the non-Policy Program documents could be
considered endorsements to the National Union Policies, because those documents refer to the
Policies.  *See Nat'l Grange Mut. Ins. Co. v. Santaniello*, 961 A.2d 387, 396 (Conn. 2009)
("'Because the policy is the contract, the intent to incorporate endorsements and riders into the
contract, and thus change its terms, must be made clear.  The manner of making an endorsement
is immaterial, as long as the intent that it be a part of the contract can be ascertained.'" (quoting 2
L. Russ & T. Segalla, *Couch on Insurance* § 18:17 at 18-27 (3d ed. 2005)).

The Court need not determine whether the Program documents must be construed
together under any theory or combination of theories, because whether the Court considers the
National Union Policies in isolation, or construes the Policies and the other Program documents
in each year as a single contract, the Court would conclude that National Union owed Valspar a
duty to defend.  The Court will therefore assume, without deciding, that it may consider all of the
Program documents related to a particular Program year in determining whether National Union
had a duty to defend.

[27] In support of its argument that Continental lacks standing, Valspar cites to *Home
Lumber Co. v. Kopfmann Homes, Inc.*, 535 N.W.2d 302 (Minn. 1995).  *Home Lumber* involved
lien claimants that "were neither parties to, nor the intended beneficiaries of, [a] construction
loan agreement" and sought to question the contracting parties' compliance with the loan
agreement's terms in order to achieve priority for their liens.  *Id.* at 304-05.  The court explained
that it was unclear whether the lien claimants had standing to "question compliance" with the
terms of the loan agreement.  *Id.* at 305.  Because the challenged compliance related to
conditions precedent which the parties to the contract were free to, and did, waive, the court
explained that the lien claimants, as "strangers" to the contract, "have no ground to complain
because of such waiver."  *Id.* at 305 (internal quotation marks omitted).  The Court finds that
*Home Lumber* is inapposite to the present case.  First, Continental is not seeking to challenge

(Footnote continued on next page.)

Prior to 2010, under Minnesota law, an insurer that defended or participated in the defense of an insured had no basis to seek recovery of defense costs from another insurer. *See Iowa Nat'l Mut. Ins. v. Universal Underwriters Ins. Co.*, 150 N.W.2d 233, 237 (Minn. 1967). In *Iowa National*, the court determined that because there was no contractual privity between two insurers that both owed a duty to defend the same insured, there was no contractual basis for one insurer to recover defense costs from another. *See id.* at 236-37. Furthermore, the court determined that there was no equitable right to seek contribution because two such insurance companies "have no joint liability or common obligation. Both were obligated to defend under separate contractual undertakings which would not support a common obligation for the purpose of invoking the principle of contribution." *Id.* at 237. Finally, the court determined that an insurer who paid defense costs also had no right of recovery based on subrogation because each insurance company implicated by an underlying suit had "a separate and distinct obligation to defend." *Id.* Therefore, under *Iowa National*, each individual insurance company had a separate and complete duty to defend, and could not recover defense costs from another insurance company. *Id.* at 237-38.

In *Cargill*, the Minnesota Supreme Court overruled *Iowa National*, and held that "a primary insurer that has a duty to defend, and whose policy is triggered for defense

_____

(Footnote continued.)

National Union and Valspar's compliance with the Program documents. Whether National Union breached any duty it owed to Valspar, or whether National Union and Valspar have been operating the Program in a manner that is contrary to the Program's contractual language is irrelevant to the present inquiry. Rather, Continental seeks only a determination of what National Union's and Valspar's obligations under the Program are. Second, as explained below, in granting insurers that incur defense costs a right to seek contribution from other insurers, the Minnesota Supreme Court has granted standing upon parties such as Continental to seek an interpretation of the insurance policies of other insurers.

purposes, has an equitable right to seek contribution for defense costs from any other insurer who also has a duty to defend the insured, and whose policy has been triggered for defense purposes." *Cargill*, 784 N.W.2d at 354.  Because Minnesota has recognized a right of equitable contribution between co-insurers, when one insurer pays more than its share of defense costs, it "ha[s] standing to bring a claim for contribution." *CNH Capital v. Janson Excavating Inc.*, 872 N.E.2d 980, 984 (Ohio Ct. App. 2007).[28]

It is true that "an action for equitable contribution is based on equity and does not depend upon the contractual rights of the insured." *Liberty Mut. Ins. Co. v. Lumbermens Mut. Cas. Co.*, 525 F. Supp. 2d 993, 995 (N.D. Ill. 2007).[29]  But "[i]n deciding whether one insurer is liable for equitable contribution to another, the inquiry is whether the nonparticipating coinsurer had a **legal obligation** to provide a defense or indemnity coverage for the claim or action[.]" *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 872 (Wash. 2008) (emphasis in original) (internal quotation marks and alterations omitted); *see also Cargill*, 784 N.W.2d at 352 (explaining that an insurer can only seek contribution from another insurer that also owed a duty to defend the insured).  Whether

---

[28] *See also Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 540 (S.D.N.Y. 2006) (recognizing "a cause of action for pro rata contribution when a co-insurer pays more than its fair share for a loss covered by multiple insurers"); *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal. Rptr. 2d 296, 303 (Cal. Ct. App. 1998) ("Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured.").

[29] *See also Signal Cos. v. Harbor Ins. Co.*, 612 P.2d 889, 895 (Cal. 1980) ("The reciprocal rights and duties of several insurers who have covered the same event do not arise out of the contract, for their agreements are not with each other. . . .  Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.  As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders." (internal quotation marks omitted)).

an insurer has a legal obligation to defend the insured necessarily stems from an interpretation of the insurance policy. *See Remodeling Dimensions, Inc.*, 819 N.W.2d at 616 (explaining that the duty to defend is contractual).   Therefore a claim for equitable contribution allows, and indeed requires, the court to determine whether the insurer against whom equitable contribution is sought owed the insured a duty to defend by examining that insurer's policy. *Cf. Land O'Lakes, Inc. v. Emp'rs Mut. Liability Ins. Co. of Wis.*, 846 F. Supp. 2d 1007, 1018-19, 1041-42 (D. Minn. 2012) (applying *Cargill* and interpreting several insurance policies to determine which insurance company had a duty to defend).[30]   The fundamental question in an equitable contribution action is precisely the question Continental seeks to have determined here – does National Union owe an obligation to Valspar such that National Union can be liable to Continental for contribution?   The right to seek contribution would be meaningless if a co-insurer could stymie attempts to seek contribution by asserting it does not have a duty to defend, and then preventing the paying insurer from examining the insurance policy to challenge that assertion.   Therefore, the Court concludes that Continental has standing to bring a claim for equitable contribution, and in doing so may request an interpretation of the contracts between National Union and Valspar.

---

[30] *See, e.g.*, *Am. Cas. Co. of Reading, Pa. v. Health Care Indem., Inc.*, 520 F.3d 1131, 1137 (10th Cir. 2008) (explaining that the court "examine[s] the policies" and "consider[s] the respective defense obligations" of insurers in determining whether equitable contribution is available).

B.      **Principles of Contract Interpretation**

The parties agree that Minnesota law applies to interpretation of the Program.[31]
"General principles of contract interpretation apply to insurance policies." *See Lobeck v.
State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). When interpreting
insurance contracts, the Court's objective is to "ascertain and give effect to the intentions
of the parties as reflected in the terms of the insuring contract." *Jenoff, Inc. v. N.H. Ins.
Co.*, 558 N.W.2d 260, 262 (Minn. 1997). "The plain and ordinary meaning of the
contract language controls, unless the language is ambiguous." *Bus. Bank v. Hanson*, 769
N.W.2d 285, 288 (Minn. 2009). A contract is ambiguous if its language "is susceptible to
two or more reasonable interpretations." *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45
(Minn. 2008). "Extrinsic evidence of the parties' subjective intent cannot be used to
create contractual ambiguity where none exists on the face of the policy." *In re SRC
Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008) (citing *In re Hennepin Cnty. 1986
Recycling Bond Litig.*, 540 N.W.2d 494, 498 (Minn. 1995)).

Additionally, the Court construes contracts as a whole, *Watson v. United Servs.
Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn. 1997), and must give effect to all of its
language, *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn. 2009); *Koch v.
Han-Shire Investments, Inc.*, 140 N.W.2d 55, 62 (Minn. 1966) ("The cardinal purpose of

---

[31] The parties have relied exclusively on Minnesota law throughout this action, despite
the fact that at least two of the Program documents contain a choice of law clause stating that
New York law applies to interpretation of the documents. (*See* Second Quast Aff., Ex. 22 at
1151 ("This Agreement will be governed by and construed in accordance with the laws of the
State of New York."); Ex. 24 at 1241.) None of the parties have mentioned these clauses, nor
have the parties identified any aspect of New York law that would change the outcome of this
case. Because the parties apparently agree that Minnesota law governs interpretation of all of the
Program documents, the Court will apply Minnesota law to all of the Program documents.

construing a contract is to ascertain the intention of the parties from the language used by them and by a construction of the entire agreement or writings of which the contract consists."). The Court "will not adopt a 'construction of an insurance policy which entirely neutralizes one provision . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent." *Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) (quoting *Wyatt v. Wyatt*, 58 N.W.2d 873, 875 (Minn. 1953)).

If the Court finds a contract's terms to be ambiguous or conflicting, then it "may weigh extrinsic evidence to assist in construing the language." *Barker v. Cerdian Corp.*, 122 F.3d 628 (8th Cir. 1997); *see also Hous. & Redevelopment Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005). Such extrinsic evidence can include the interpretation the contracting parties give to a contract. *Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966). As the Minnesota Supreme Court has explained:

> Where ambiguity exists in the terms of a contract, it is well settled that the construction the parties in their dealings and by their conduct have placed upon those terms furnish the court with very persuasive evidence of the true meaning of the same. In other words, courts accept the practical construction the parties to an ambiguous contract have given it.

*City of S. St. Paul v. N. States Power Co.*, 248 N.W. 288, 291 (Minn. 1933). "Where such extrinsic evidence is conclusive and undisputed and renders the meaning of the contract clear, its construction again becomes a question of law for the court." *Leslie v. Minneapolis Teachers Ret. Fund Ass'n*, 16 N.W.2d 313, 316 (Minn. 1944). However, the parties' "[p]ractical construction will not control unless it is one which reasonable minds might adopt." *Wicker v. Modern Life Ins. Co.*, 261 N.W. 441, 442 (Minn. 1935).

## C.   Duty to Defend in the National Union Policies

The National Union Policies issued as part of the Program in each year contain language explicitly stating that National Union "will have the right and duty to defend any 'suit' seeking [damages to which this insurance applies]."  This clause is unambiguous, and places the duty to defend Valspar upon National Union.  In order to avoid application of this unambiguous language, National Union must identify language in the other Program documents or in other parts of the Policies themselves which either unambiguously disclaims this duty to defend clause, or creates an ambiguity with respect to whether National Union owed a duty to defend.

### 1.   The 1990-1991 Through 1992-1993 Program Years

The first three Program years each contain a National Union Policy stating that National Union has a duty to defend.  Additionally, the first three Program years contain an Indemnity Agreement, a Policy and Funding Schedule, and a Promissory Note. Neither the Policy and Funding Schedule nor the Promissory Note mentions a duty to defend, nor do they contain any language that could be interpreted as implicating a duty to defend.  None of the parties have cited to any portion of either the Policy and Funding Schedule or the Promissory Note as supporting the argument that National Union did not owe a duty to defend.  Therefore, the only possible Program document in the first three Program years that could disclaim National Union's duty to defend is the Indemnity Agreement.

The Indemnity Agreements require Valspar to "indemnify [National Union] against and Reimburse it in full for each Reimbursable Loss."  This provision refers only to National Union's indemnification obligations, and therefore does not impact the "duty

to defend" language found in the National Union Policies.  The Agreements further provide that Valspar "will indemnify [National Union] and Reimburse it in full for [defense costs]" in a manner based on a specified application of the retention limits.  This provision, although it refers to **defense costs**, does not revoke National Union's **duty to defend** in the insurance policies, nor does it create any ambiguity regarding which entity had the duty to defend.  Instead, this provision in the Indemnity Agreements merely identifies Valspar's obligation to reimburse National Union.  Simply because National Union will ultimately be reimbursed for certain costs it expends in defending Valspar does not indicate that it does not have a duty to defend Valspar.  As explained above, the duty to defend encompasses more than the mere payment of money.  *See In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d at 425.  Under the Program National Union never disclaimed a duty to defend, and instead simply required Valspar to reimburse it for defense expenses.  It is immaterial that the Indemnity Agreements defined Valspar's reimbursement obligation as either an obligation to reimburse National Union for payments National Union had already made or to provide National Union with the funds out of which to make payments in the first instance.  Either scheme again contemplates mere reimbursement, with National Union retaining the duty to defend and its accompanying obligations.

The fact that the Indemnity Agreements did not alter National Union's duty to defend contained in the Policies is further confirmed by the provision stating that "[a]ny recitals in this [Indemnity] Agreement of the terms and provisions of the Policy(ies) are merely descriptive and [Valspar] is indemnifying, to the extent and in the amounts herein provided, **the obligations of [National Union] under the Policy(ies)**." (Emphasis

added.)   This provision indicates that National Union's obligation to defend Valspar under the Policy is not changed or removed by the Indemnity Agreements.   Therefore the Court finds that, under the plain language of the first three Program years, National Union owes a duty to defend Valspar against any claims arguably falling within the scope of the National Union Policies during the first three Program years.

### 2.      The 1993-1994 and 1994-1995 Program Years

The 1993-1994 and 1994-1995 Program years contain all of the same documents present in the first three Program years.   The only addition to the 1993-1994 and 1994-1995 Program years is the Deductible Endorsements.   Because the Court has already concluded that the set of documents comprising the first three Program years do not eliminate or alter National Union's duty to defend, the Court need only consider the Deductible Endorsement in determining whether National Union owes a duty to defend in the 1993-1994 and 1994-1995 Program years.

The Deductible Endorsements provide that National Union's obligation to pay damages to third parties on Valspar's behalf only applies to damages in excess of the stated deductible amount.   This provision governs only National Union's duty to indemnify.   With respect to the duty to defend, however, the Deductible Endorsements specifically state that National Union's "right and duty to defend . . . apply irrespective of the application of the deductible amount."   Therefore, under the Deductible Endorsements, National Union retains its duty to defend imposed by the National Union

Policies.[32]  *See S. Healthcare Servs., Inc. v. Lloyd's of London*, ___ So. 3d ___, 2013 WL 628661, at *12 (Miss. Feb. 21, 2013) (finding that an insurer did have a duty to defend under a Deductible Liability Insurance Endorsement stating that the insurer's "right and duty to defend . . . apply irrespective of the application of the deductible

---

[32] Valspar and National Union both rely heavily upon general principles regarding the use of deductibles and self-insured retentions in the industry in arguing whether National Union had a duty to defend.  However, the Court finds that general principles about how deductibles and self-insured retentions can or typically do operate is irrelevant in light of the clear and unambiguous language of the Program documents.  *See Eng'g & Constr. Innovations, Inc.*, 825 N.W.2d at 704 (explaining that the Court's "objective when interpreting insurance contracts is to ascertain and give effect to the intentions of the parties **as reflected in the terms of the insuring contract**" (emphasis added) (internal quotation marks omitted); *see also The Ins. Cos. v. Wright*, 68 U.S. 456, 470 (1863) (explaining that where a policy is subject to only one reasonable interpretation on its face, the court cannot examine "usage or custom" in interpreting the policy).  If Valspar and National Union wished for their Program to operate in the manner that other deductible and self-insured retention schemes operate in the insurance industry, they could have chosen language for their Program which dictated such an operation.  *See, e.g.*, *State Nat'l Ins. Co. v. Cnty. of Camden*, Civ. No. 08-5128, 2012 WL 6652819, at *1 (D.N.J. Dec. 19, 2012) (describing an insurance policy which stated in a self-insured retention endorsement that the **insured** "shall be obligated to provide an adequate defense and investigation of any action for or notice of any actual, potential or alleged damages"); *Genesis Ins. Co. v. BRE Props.*, No. C-12-00368, 2013 WL 57804, at *12 (N.D. Cal. Jan. 3, 2013) (finding under the plain language of a policy that the insurer "does not have a duty to defend" even though the insuring agreement originally provided that the insurer had "the right and duty to defend" because a Self-Insured Retention Endorsement modified coverage and stated that that insurance company had "no duty to defend").

Valspar and National Union also seem to argue that even if National Union retained a duty to defend under the Program, that duty could not be triggered until Valspar had satisfied the amount of the deductible.  Some deductible endorsements do provide that the insurer has no duty to defend until the deductible or retention has been satisfied by the insured.  *See Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.*, 139 Cal. Rptr. 3d 578, 583 (Cal. Ct. App. 2012) ("[T]he policy stated [the insurer] had no duty to investigate or defend any claim until [the insured] satisfied the [self-insured retention]."); *Geisler v. Everest Nat'l Ins. Co.*, 980 N.E.2d 1170, 1185 (Ill. Ct. App. 2012) (finding that an insurer did not have a duty to defend pursuant to a self-insured retention provision which stated that the insurer "shall have the right but not the duty or obligation to defend any 'claim' or suit against an 'Insured'").  The Program, however, contains no such language, and instead expressly indicates that the Deductible Endorsements do not alter National Union's duty to defend Valspar found in the Policies.

amount").[33]   The Court therefore concludes that, according to the plain language of the Program documents, National Union has a duty to defend Valspar during the 1993-1994 and 1994-1995 Program years.

### 3.     The 1995-1996 Through 1999-2000 Program Years

The 1995-1996 through 1999-2000 Program years each contain a National Union Policy stating that National Union has a duty to defend.  The National Union Policies during these Program years contain a Deductible Endorsement and a Large Risk Endorsement.  Additionally, the 1995-1996 through 1999-2000 Program years contain a Payment Agreement and a Schedule of Policies and Payments.  As explained above, the Deductible Endorsements do not disclaim or alter National Union's duty to defend.  In fact, the Deductible Endorsements expressly reaffirm that National Union has a duty to defend.  The Schedules of Policies and Payments merely list Policies to which the Payment Agreements are applicable and set forth the timing of Valspar's payments to National Union and do not reference a duty to defend.  Therefore the Court will consider only the Large Risk Endorsements and the Payment Agreements in determining whether National Union owes a duty to defend Valspar during the 1995-1996 through 1999-2000 Program years.

The Large Risk Endorsements essentially set forth Valspar's obligation to pay premiums to National Union, and detail the formulas used to calculate those premiums.

---

[33] *See also Century Indem. Co. v. Marine Grp., LLC*, No. 3:08-CV-01375, 2012 WL 6016953, at *2 (D. Or. Dec. 3, 2012) ("[T]o the extent the deductible endorsement modifies the relationship between the insurer and the insured by establishing a deductible and creating a system of payment based on that deductible, the deductible endorsement does not interfere with the duty to defend set forth under the original policy" (internal quotation marks omitted)).

In describing Valspar's premium calculation, the Large Risk Endorsements state that a component of the calculation consists of "all costs, fees and expenses [National Union] incurs in [its] investigation, negotiation, settlement or defense of claims or suits against [Valspar]."  This provision does not disclaim or alter the duty to defend language in the Policies, but rather seems to confirm that National Union retains its duty to defend despite the unique nature of the Program.  Additionally, the Large Risk Endorsements provide that components of Valspar's premium will be reduced by any amount that Valspar must reimburse National Union for under any deductible terms that are part of the Policies.  The Deductible Endorsements during these Program years obligated Valspar to reimburse National Union only with respect to indemnity costs, not defense costs, therefore this provision does not implicate defense costs at all.  More importantly, even if the Large Risk Endorsements reference Valspar's obligation to reimburse National Union, as explained above, this provision speaks only of an obligation to reimburse money and does not implicate or change National Union's duty to defend under the Policies.

The Payment Agreements in these Program years also do not disclaim or alter National Union's duty to defend under the Policies.  The Pre-1998 Agreements direct Valspar to pay National Union "the deductible or reimbursable portions of all losses that [National Union] pays on [Valspar's] behalf under such Policies as are subject to deductible or loss reimbursement terms."  This provision only indicates that Valspar has a duty to reimburse National Union for certain costs, which is not the same as a duty to defend, and therefore does not change or create any ambiguity regarding National Union's duty to defend.

Similarly the Post-1998 Payment Agreements set forth Valspar's obligation to make certain payments to National Union. Valspar's obligation includes payment of Deductible Loss Reimbursements, which are defined as the portion of any indemnity cost or defense cost that "[National Union] pay[s] that [Valspar] must reimburse [National Union] for under any 'Deductible' provisions of a Policy." Although the Post-1998 Payment Agreements reference defense costs, the provision refers only to Valspar's reimbursement obligation, and not National Union's duty to defend in the first instance. Furthermore, as under the Pre-1998 Agreements, during these Program years, the "'Deductible' provisions" of the Policies refer only to Valspar's obligation to reimburse National Union for indemnity costs, not defense costs, indicating that the language of the Payment Agreements does not implicate interpretation of which entity had a duty to defend or which entity was responsible for paying defense costs. Because none of the documents in Program years 1995-1996 through 1999-2000 disclaim or create any ambiguity regarding National Union's duty to defend under the Policies, the Court concludes that National Union has a duty to defend Valspar in these Program years.

### 4.    The 2000-2001 Through 2003-2004 Program Years

The 2000-2001 through 2003-2004 Program years each contain a National Union Policy stating that National Union has a duty to defend. The National Union Policies during these Program years contain a Deductible Defense Costs Endorsement and a Large Risk Endorsement. Additionally, the 2000-2001 through 2003-2004 Program years contain a Direct Payment Agreement and a Schedule of Policies and Payments. As explained above, the Large Risk Endorsements and the Schedules of Policies and Payments do not disclaim or alter National Union's duty to defend. Therefore the Court

will consider only the Deductible Defense Costs Endorsements and the Direct Payment Agreements in determining whether National Union owes a duty to defend Valspar during the 2000-2001 through 2003-2004 Program years.

The Deductible Defense Costs Endorsements state that National Union "will pay all sums [it] become[s] obligated to pay up to [the] Limit of Insurance under the policy to which this endorsement is attached."  Valspar is then required to reimburse National Union "up to the Deductible Limit(s) shown in the Schedule for any amounts [National Union has] so paid as damages, benefits or Medical Payments."  This provision refers only to National Union's duty to indemnify, and therefore does not modify the plain language of the Policies imposing a duty to defend upon National Union. The Endorsements also obligate Valspar to reimburse National Union for defense costs up to the deductible limit in the 2000-2001 and 2001-2002 Program years, and without limitation in the 2002-2003 and 2003-2004 Program years.  This provision again, merely requires Valspar to reimburse National Union for defense costs, and does not eliminate National Union's duty to defend.   Furthermore, the Deductible Defense Costs Endorsements state that the Endorsements apply solely between Valspar and National Union and do "not affect the rights of others under this policy."  This provision indicates that the Endorsements may affect only the allocation of costs between Valspar and National Union.   Because Continental is currently seeking to enforce its right to contribution to defense costs as a result of National Union's duty to defend under the Policies, it would seem that the Deductible Defense Costs Endorsements should not be read to eliminate Continental's right to contribution under the Policies. Valspar and National Union could have included language in the Program disclaiming National

Union's duty to defend, but chose not to.  *See Cal. Dairies, Inc. v. RSUI Indem. Co.*, No. 1:08-CV-00790, 2010 WL 2598376, at *2 (describing policy language which stated "Advancement of Defense Expenses; Insurer Has No Duty to Defend") (E.D. Cal. June 25, 2010).[34]  Because the Court finds no ambiguity, the Court cannot rewrite the Program documents to relieve National Union of its duty to defend.

Finally, the Court finds that the Direct Payment Agreements do not disclaim or modify National Union's duty to defend under the Policies.[35]  As an initial matter, the Direct Payment Agreements confirm that National Union has a duty to defend in all of the Program years prior to 2000-2001.  The Direct Payment Agreements state that National Union bears the responsibility to "provide [Gallagher] with the funds necessary to enable [Gallagher] to pay [Valspar's] share of losses and [defense expenses]" to third parties.[36]  This provision indicates that National Union (through Gallagher) is responsible

---

[34] *See also Omega Flex, Inc. v. Pac. Emp'rs Ins. Co.*, 937 N.E.2d 52, 58-59 (Mass. Ct. App. 2010) (describing a policy whereby the insured agreed that the insurer "shall not have any duty to defend any such 'suit,' or to pay with respect to any claim or 'suit' any [defense costs] within the Deductible amounts").

[35] With respect to which documents comprise the Program in a particular year, Valspar argues that the Direct Payment Agreement entered into in May 2000 changed the Program for all Program years, and should be read as one of the Program documents for each Program year.  The Court need not decide whether the Direct Payment Agreement modified all of the Program years, because, even if the Court were to consider the Direct Payment Agreement in Program years prior to 2000-2001 it would still reach the conclusion that National Union owed a duty to defend Valspar in the Program years prior to 2000-2001.

[36] It is immaterial to the Court's conclusion regarding the duty to defend that Gallagher, and not National Union itself, administered National Union's obligations under the Policies.  It is common for insurance companies to contract with outside claims adjusters.  *See, e.g., Silon v. Am. Home Assurance Co.*, No. 2:08-cv-1798, 2009 WL 1090700, at *1-*3 (D. Nev. Apr. 21, 2009) (discussing numerous cases in which insurance companies contracted with third-party claims adjusters).  Under such arrangements, an insurance company retains its duty to indemnify and duty to defend its insured as defined in the policy, but contracts with a claims adjuster to fulfill those obligations.  If a duty to defend or indemnify is breached, generally an insured only

(Footnote continued on next page.)

for providing Valspar with a defense for claims implicating the Policies.  National Union is responsible for paying those costs, and pursuant to the other Program documents Valspar will then reimburse National Union for some of those costs.  The Direct Payment Agreements go on to state that National Union and Valspar agree that Valspar will "assume the responsibility for payment of" Valspar's share of losses and defense expenses while National Union "continue[s] to guarantee Valspar's fulfillment of those Obligations."  To effectuate this assumption of direct responsibility, the Direct Payment Agreements provide that Valspar "agree[s] to assume all Obligations to make payments of Fees and Losses due to [Gallagher] upon receipt of either [National Union's] statement or [Gallagher's] statement therefor."  Valspar and National Union argue vehemently that this provision negated National Union's duty to defend.  Such an interpretation is not, however, supported by the plain language of the Direct Payment Agreements.  The Agreements rearrange the manner in which reimbursement for defense costs occur, but they do not appear to impact the clear and unambiguous Policy language stating that National Union has a duty to defend.  Before the Direct Payment Agreements, Gallagher carried out National Union's contractual duty to defend Valspar.  National Union would then pay defense costs and bill Valspar for Valspar's share, if any, of those costs pursuant to the other Program documents.  Under the Direct Payment Agreements, Gallagher still

_____

(Footnote continued.)

has recourse against the insurance company, not the claims adjuster.  *See* Lee R. Russ & Thomas F. Segalla, 3 *Couch on Insurance* § 48:64 (3d Ed. 2012) (explaining that "[a]n insured is not a third-party beneficiary to a contract between an insurer and an independent insurance adjuster hired by the insurer to investigate a loss . . . . [a]ccordingly, an insured cannot maintain an action against the insurance adjuster for breach of contract or breach of fiduciary duty (footnote omitted)).  Thus, whether National Union itself was adjusting claims, or whether they contracted out those responsibilities, according to the Program documents National Union still retained a duty to defend.

carries out National Union's contractual duty to defend Valspar. The Direct Payment Agreements only remove the step where National Union pays defense costs directly to Gallagher and then bills Valspar. Instead, Valspar now pays its share of defense costs directly to Gallagher. This arrangement, like the Program in other years, merely amounts to Valspar's obligation to reimburse National Union (via Gallagher) for costs incurred in defending Valspar from claims arising under the National Union Policies. Because nothing in the Program documents disclaims or alters National Union's duty to defend Valspar under the Policies, the Court finds that National Union owes a duty to defend Valspar during the 2000-2001 through 2003-2004 Program years.[37]

---

[37] Because the Court has determined that none of the Program years contain any ambiguity regarding National Union's duty to defend Valspar in the Policies, the Court will not consider Valspar and National Union's allegations regarding how they actually operated the Program. *See Hous. & Redevelopment Auth. of Chisholm*, 696 N.W.2d at 337 ("Under a contract analysis, we first look to the language of the contract and examine extrinsic evidence only if the contract is ambiguous on its face."); *see also Wilmot v. Minneapolis Auto. Trade Ass'n*, 210 N.W. 861, 861 (Minn. 1926) (stating that extrinsic evidence of how the parties interpret a contract cannot be considered by the court where such evidence contradicts "an expressed contractual intent"). Moreover, the Court's determination that National Union owes a duty to defend Valspar for the underlying suits triggering the Program years is unaffected by Continental's seeming agreement with the defendants that National Union did not owe a duty to defend. In its moving papers and at oral argument, Continental refused to specify whether (as indicated in its complaint) it was seeking contribution from National Union due to National Union's duty to defend, or whether it agreed with Defendants that National Union did not owe a duty to defend, and therefore sought contribution from Valspar. Continental's unwillingness to review the Program documents and clarify in its motion papers which party it sought contribution from does not relieve the Court of its obligation to review the terms of the Program in order to ascertain whether National Union owes a duty to defend Valspar. Finally, it is irrelevant to the Court's analysis that the Program, in retaining National Union's duty to defend, may not represent an ideal structure for an insurance program in terms of the parties' business practices. *See In re SRC Holding Corp.*, 545 F.3d at 668 ("In the absence of contractual ambiguity, whether policy coverage 'makes sense' as a business matter is largely irrelevant; freely contracting actors in the marketplace, particularly sophisticated business entities who rely on experts to advise them, are best suited to determine what makes the most economic sense, and the language they have mutually negotiated and agreed to is the best evidence of what the parties intended.").

### III.    NATIONAL UNION'S DUTY TO CONTRIBUTE

Having determined that National Union owes a duty to defend Valspar during all of the Program years, the Court can now return to the matter at hand – Continental's attempt to seek contribution from National Union to defense costs Continental incurred in defending Valspar against the underlying lawsuits.  Under *Cargill*, the Court finds that Continental has a clear right to seek contribution from National Union.  *See* 784 N.W.2d at 354.  As the Court has previously determined, National Union owed a duty to defend Valspar under each Program year.  It is also undisputed that all four underlying lawsuits triggered coverage under the National Union Policies.  Under Minnesota law, an insurer's duty to defend is triggered when the insured has provided the insurer with notice and tendered defense of the underlying lawsuit.  *See Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 531 (Minn. 2003); *see also Cargill*, 784 N.W.2d at 354 n.14.  Tender need not be formal in order to trigger the insurer's duty to defend, and it is sufficient if an insured provides notice of the underlying lawsuit "even without an express request for a defense." *Home Ins. Co.*, 658 N.W.2d at 533.  It is undisputed that Valspar sent letters notifying National Union of the four underlying lawsuits that stated Valspar was "tendering this matter to the carriers listed on the attached 'Schedule A' [including National Union Policies] to provide Valspar with a complete defense, and to otherwise fulfill your policy obligations."   Therefore, Continental has satisfied the

necessary prerequisites to be entitled to contribution from National Union. *See Cargill*, 784 N.W.2d at 354.[38]

## A.     Waiver Under the Loan Receipt Agreement

Valspar argues that Continental waived any right to contribution in the Loan Receipt Agreement, which states that "Continental agrees not to seek recovery from Valspar for defense costs advanced by Continental in connection with the Underlying Action and agrees to waive any right of recovery from Valspar for such costs."  The Court must determine if by pursuing contribution to defense costs from National Union, some of which may ultimately be paid by Valspar, Continental is pursuing a right that it expressly waived by entering in the Loan Receipt Agreement.  The Court concludes that Continental did not waive its right to contribution by entering into the Loan Receipt Agreement.

First, the plain language of the Loan Receipt Agreement only waives Continental's right of recovery from Valspar.  Pursuant to its complaint and this Order, Continental is seeking recovery from National Union, not Valspar.  Valspar and National Union are

---

[38] National Union argues that it does not have common liability with Continental sufficient to trigger the equitable contribution contemplated by *Cargill*, because under the Program National Union does not bear the ultimate responsibility to pay all of Valspar's defense costs.  Similarly, Valspar argues that "Continental must prove that National Union, not Valspar, is ultimately responsible for paying defense costs" in order to seek contribution from National Union.  (Valspar's Mem. in Supp. of Mot. for Summ. J. at 21, May 31, 2012, Docket No. 186.) National Union's and Valspar's arguments do not seem to be consistent with *Cargill*'s holding. In *Cargill*, the court specifically stated that "[a] primary insurer that has a duty to defend, and whose policy is triggered for defense purposes, has an equitable right to seek contribution for defense costs **from any other insurer who also has a duty to defend the insured**." 784 N.W.2d at 354 (emphasis added).  The Court reads *Cargill* to apply to all insurers with a duty to defend, irrespective of whether those costs may ultimately be borne by the insured through reimbursement, payment of premiums, or other mechanisms.

distinct entities; therefore, the Loan Receipt Agreement does not apply to the present situation.

Additionally, the Loan Receipt Agreement appears to be unenforceable for a lack of consideration. Prior to *Cargill*, each insurance company had a separate and complete duty to defend, and could not seek contribution from other insurers. *See Iowa Nat'l Mut. Ins.*, 150 N.W.2d at 237. To avoid application of this default rule, the insured and defending insurer could enter into a valid loan receipt agreement. *See Home Ins. Co.*, 658 N.W.2d at 527. "Under a loan receipt agreement, an insurer makes a loan to the insured for defense costs, which the insured agrees to repay from amounts recovered from another insurer." *Cargill*, 784 N.W.2d at 345 n.5; *see also Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 164 (Minn. 1986). A valid loan receipt agreement provided an insurer with standing to seek contribution from other insurers for the reimbursement of defense costs. *Home Ins. Co.*, 658 N.W.2d at 527. Because the controversy at issue began before the Minnesota Supreme Court decided *Cargill*, Continental and Valspar entered into a loan receipt agreement.

To be valid, a loan receipt agreement must involve "'actual transfer [of a right to recovery].'" *Azcon Corp v. Odyssey Re (London) Ltd.*, No. A04-216, 2004 WL 2793253, at *3 (Minn. Ct. App. Dec. 7, 2004) (quoting *Jostens*, 387 N.W.2d at 164). A defending insurer can therefore only pursue contribution against other insurance companies to the extent the loan receipt agreement transfers such a right. *See Home Ins. Co.*, 658 N.W.2d at 525, 527 (explaining that the insurance company that had entered into a loan receipt agreement could pursue contribution because it had "reserve[ed] its right to seek reimbursement from other insurers").

Here, the Loan Receipt Agreement does not explicitly transfer or assign any recovery rights to Continental.  It does not require Valspar to seek recovery from other insurers, and does not authorize Continental to bring any claims against non-defending insurers.  Because the Loan Receipt Agreement did not transfer a right of recovery, it is invalid to the extent Continental would attempt to use it to seek recovery from National Union or any of Valspar's other historical insurers.  Due to *Cargill*, however, such validity is no longer necessary in order for Continental to pursue contribution.  But the failure to transfer a right of recovery also implicates the validity of the Agreement more generally.  Because Valspar did not transfer a right of recovery, it provided nothing in exchange for Continental's promise not to pursue Valspar for contribution.  Rather, the Loan Receipt Agreement seems to simply memorialize the contractual agreement that already existed between Continental and Valspar pursuant to the Continental Policies.  Therefore, the Court finds that the Loan Receipt Agreement is invalid for lack of consideration, and cannot preclude Continental from maintaining an action for equitable contribution against National Union.  *See Hilde v. Int'l Harvester Co. of America*, 207 N.W. 617, 618 (Minn. 1926) (finding no consideration where "[p]laintiff did nothing for defendant that he was not required to do under the original contract").

### B.     Breach of the Duty to Defend

An insurer's breach of its duty to defend "precludes application of an equitable right to contribution."  *Cargill*, 784 N.W.2d at 354.  Therefore, in order to determine whether Continental can seek reimbursement from National Union, the Court must

determine whether Continental breached its duty to defend by failing to pay approximately $15,000 in legal expenses allegedly requested by Valspar.[39]

In order to determine whether Continental breached its duty to defend, the Court must determine the scope of Continental's duty in the present case.  Generally, in the absence of an actual conflict of interest between the insured and the insurer, the insured has no right to choose independent defense counsel to provide the insured with a defense.  *Mut. Serv. Cas. Ins. Co. v. Luetmer*, 474 N.W.2d 365, 368 (Minn. Ct. App. 1991).  When a conflict of interest exists – such as when an insurer accepts the tender of defense but also disputes coverage – the insurer's duty to defend is transformed into a "duty to reimburse [the insured] for reasonable attorneys' fees."  *Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 391 (Minn. 1979).  In such circumstances, an insurer is only required to reimburse its insured for "reasonable" attorney's fees.  *See id.*; *see also Chicago Title Ins. Co. v. F.D.I.C.*, 172 F.3d 601, 605 (8th Cir. 1999).

---

[39] Continental also argues that even if it breached its duty to defend Valspar, it is still entitled to contribution because (1) Valspar did not raise a breach of the duty to defend counterclaim; and (2) the statute of limitations has run on any breach of the duty to defend claim that Valspar could maintain against Continental.  It is true that Valspar did not raise a breach of the duty to defend claim at any point during this litigation, and therefore, it is unlikely that Valspar could recoup the alleged $15,000 underpayment, at least in these proceedings.  *See Culpepper v. Vilsack*, 664 F.3d 252, 259 (8th Cir. 2011) ("[W]here, as here, the claims at issue do not appear in the plaintiff's pleadings, they are not properly before the court regardless of whether they were reasonably related to prior allegations[.]").  However, under *Cargill*, the fact that Valspar has failed to or might be unable to advance a breach of the duty to defend claim does not mean that Continental is entitled to contribution even if it breached its duty to defend.  *See Cargill*, 784 N.W.2d at 354 (instructing the district court on remand to determine "which insurers have a duty to defend" and whether the insurer seeking contribution "breached its duty to defend").  It is irrelevant that Valspar did not bring a breach of the duty to defend claim or that such a claim, should Valspar actually try to pursue it, may be time barred.  *See Land O'Lakes, Inc.*, 846 F. Supp. 2d at 1026, 1043-44 (examining whether an insurer had breached its duty to defend for contribution purposes after determining that the statute of limitations had run on any breach claim).

In this case, the parties dispute whether an actual conflict of interest existed between Continental and Valspar such that Continental was required to allow Valspar to retain independent counsel.  In any case, Continental and Valspar agreed that Valspar could provide its own counsel to defend the underlying lawsuits, and that Continental would reimburse Valspar for reasonable defense costs.  Therefore Continental's duty to defend was transformed into a duty to reimburse Valspar for reasonable defense costs. This transformation removes this case from the vast majority of cases in which "[a] breach of the contractual duty to defend . . . occurs by 'wrongfully refusing to defend the insured.'"  *Chicago Title Ins. Co.*, 172 F.3d at 605 (quoting *Am. Standard Ins. Co. v. Le*, 551 N.W.2d 923, 927 (Minn. 1996)).

The Court concludes that it need not examine the contours of Continental's obligation to pay reasonable costs nor determine whether Continental's failure to reimburse Valspar $15,000 out of the more than $500,000 spent defending Valspar in the underlying suits constituted a breach of the duty to defend, because under the facts of this case, any breach by Continental was insufficient to bar its right to seek contribution from other insurers.[40]

The purpose of equitable contribution "is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others."  *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal.

---

[40] Because the Court concludes that Continental's right to contribution is not barred by its alleged failure to reimburse Valspar for $15,000, the Court need not consider Continental's motion to strike as hearsay the allegations in Quast's affidavit regarding Continental's reasons for refusing payment.

Rptr. 2d 296, 303-04 (Cal. Ct. App. 1998).[41]   "Under the principle of equitable [contribution], the insurer which has performed the duty to provide a defense to its insured should be able to compel contribution for a share of the cost of defense from another insurer who had a similar obligation to the same insured but failed to perform it."[42] *Nat'l Indem. Co. v. St. Paul Ins. Cos.*, 724 P.2d 544, 545 (Ariz. 1986).  Barring an insurer from seeking equitable contribution is appropriate in the context of the general purpose of contribution when the insurer has breached its duty to defend by failing to provide the insured with any defense at all.  Courts have, therefore, refused to allow an insurer who entirely refuses to provide a defense, and is subsequently sued by its insured to recover defense costs, to seek equitable contribution from its co-insureds.  *See Land O'Lakes Inc.*, 846 F. Supp. 2d at 1013, 1043-44 (finding that insurers who breached their duty to defend when they refused to provide the insured with any defense and were later sued by their insured could not seek equitable contribution).[43]

Barring an insurer, like Continental, that has contributed hundreds of thousands of dollars to defense costs does not, however, comport with the equitable nature of contribution.  Continental did not fail to provide Valspar with a defense.  It would not

---

[41] *See also Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 212 (2d Cir. 2000) ("The controlling inquiry under an equitable analysis is whether one party is unjustly enriched at the expense of another – the law abhors unjust enrichment.").

[42] Although the Arizona court referred to "equitable subrogation" it is apparent from the context of the opinion that it is referring to the same equitable contribution right recognized in *Cargill*.

[43] *See also Kraus-Anderson Const. Co. v. Transp. Ins. Co.*, No. A10-698, 2011 WL 1364251, at *9 (Minn. Ct. App. Apr. 12, 2011) (refusing to allow an insurer to seek equitable contribution when the insurer breached its duty to defend by failing to provide a defense at all, and was sued by its insured to recover defense costs).

accomplish substantial justice, and would instead allow National Union to profit at Continental's expense if Continental was unable to seek contribution for the over $500,000 it has paid in defense costs.    Although it is certainly possible that cases could arise in which a failure to reimburse an insured could rise to the level of a complete dereliction of the duty to defend such that contribution would be inequitable, the Court finds such a circumstance is not presented here.[44]

### C.    Amount of Contribution

Under *Cargill*'s duty to contribute, each insurer "shall be responsible in equal shares for the cost of defense" of the claims at issue.    784 N.W.2d at 354 (internal quotation marks omitted).    The polices of seven insurers that owed a duty to defend Valspar [45] (including National Union's and Continental's) were triggered with respect to the four underlying lawsuits. [46]    Therefore, Continental may recover from National Union a one-seventh share of the costs it expended in defending Valspar.

---

[44]    Valspar seems to insinuate that contribution is inequitable in this case because Continental is seeking contribution for defense costs incurred by Valspar but not paid by Continental.    There appears to be no basis in the record for this situation.    Continental plainly cannot seek contribution for costs it has not incurred in defending Valspar.

[45]    Valspar contends that defense costs should be divided into eighths, because Valspar also carried excess insurance through a different insurer during the relevant period.    Generally "[t]he doctrine of equitable contribution applies to insurers who share the **same** level of obligation on the **same** risk as to the **same** insured." *Fireman's Fund Ins. Co.*, 77 Cal. Rptr. 2d at 304 n.4 (emphases in original).    Therefore "[a]s a general rule, there is no contribution between primary and excess carriers of the same insured absent a specific agreement to the contrary." *Id.*   The record contains no evidence of an agreement with Valspar's excess insurer to share costs, therefore the Court will not include the excess insurer in the division of defense costs.

[46] Continental contends in its brief that only six primary insurers are implicated in the underlying lawsuits.    This contention is contrary to the record evidence.    Valspar tendered defense of the underlying lawsuits to seven insurers that, according to the record evidence, owed

(Footnote continued on next page.)

Continental initially alleged that it had paid a total of $538,920.94 in defense costs, which would entitle it to contribution from National Union in the amount of $76,988.71.   But in its final submission to the Court, Continental produced document indicating that it paid a total of $551,060.21 in defense costs, which would entitle it to contribution from National Union in the amount of $78,722.89.   Although National Union has never contested the defense expenses incurred by Continental, Valspar did produce an invoice which indicates discrepancies in the defense expenses incurred with respect to the *Rush* action.   Because the record is unclear regarding the actual amount of defense expenses incurred by Continental, the Court will require the parties to submit information to the Court clarifying the amount of defense expenses incurred by Continental in defending Valspar against the underlying lawsuits.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

**1.**     Plaintiff Continental Casualty's motion for summary judgment [Docket No. 191] is **GRANTED in part** and **DENIED in part** as follows:

a.     Continental's motion is **GRANTED** to the extent it seeks a declaration that National Union has a duty to defend Valspar during the Program years.

_____

(Footnote continued.)

a duty to defend Valspar.   Additionally Continental's own corporate representative testified that seven insurers owed a duty to defend Valspar for the underlying lawsuits.   Therefore, despite the unsupported claims in Continental's brief, the Court will find that seven insurers are implicated.

b.    Continental's motion is **GRANTED** to the extent it seeks a declaration that National Union has a duty to contribute to Continental for costs Continental incurred in defending Valspar in the four underlying actions.

i.    Within twenty-one (21) days of the entry of this Order, Plaintiff Continental Casualty shall submit to the Court, and serve upon Defendants: (a) a letter brief not to exceed 1,500 words clarifying the amount of contribution it seeks due to costs it incurred in defending Valspar in the four underlying actions; and (b) documentation supporting its contribution request.

ii.    Within fourteen (14) days after service of Plaintiff's letter brief:

(a)    National Union may submit to the Court, and serve upon Continental and Valspar a letter brief not to exceed 1,500 words raising any objections it may have to the amount of contribution sought by Continental, together with documentation supporting its objections.

(b)    Valspar may submit to the Court, and serve upon Continental and National Union a letter brief not to exceed 1,500 words raising any objections it may have to the amount of contribution sought by Continental, together with documentation supporting its objections.

c.      Continental's motion is **DENIED** to the extent it seeks a declaration that Valspar has a duty to contribute to defense costs Continental incurred in defending Valspar in the four underlying lawsuits.

**2.**      Intervenor Defendant Valspar's motion for summary judgment [Docket No. 184] is **GRANTED in part** and **DENIED in part** as follows:

a.      The motion is **GRANTED** to the extent it seeks a declaration that Valspar does not have a duty to contribute to defense costs Continental incurred in defending Valspar in the four underlying lawsuits.

b.      The motion is **DENIED** to the extent it seeks a declaration that National Union does not have a duty to defend under the Program years.

c.      The motion is **DENIED** to the extent it seeks a declaration that National Union does not owe a duty to contribute to defense costs Continental incurred in defending Valspar in the four underlying lawsuits.

**3.**      Defendant National Union's request for judgment independent of a motion [Docket No. 205] is **DENIED**.

DATED:  August 9, 2013                    _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                United States District Judge